# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERON MCKAY, | : | |
| | : | |
| Plaintiff | : | No. 3:14-CV-2020 |
| | : | |
| vs. | : | (Judge Nealon) |
| | : | |
| CAROLYN W. COLVIN, Acting | : | |
| Comissioner of Social Security, | : | |
| | : | |
| Defendant | : | |

## <u>MEMORANDUM</u>

On October 17, 2014, Plaintiff, Sheron McKay, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §

1461 <u>et</u> <u>seq</u>.  (Doc. 1).  The parties have fully briefed the appeal.  For the reasons

set forth below, the decision of the Commissioner denying Plaintiff's applications

for DIB will be vacated.

---

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on March 29, 2012 alleging disability beginning on May 10, 2011 due to back, leg, knee, and foot injuries and depression. (Tr. 15, 34, 167).[3] The claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on June 4, 2012. (Tr. 15). On June 11, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 15). A hearing was held on May 7, 2013 before administrative law judge Michele Stolls ("ALJ"), at which Plaintiff and an impartial vocational expert, Nadine Henzes ("VE"), testified. (Tr. 15). On July 15, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff could perform light work with limitations. (Tr. 19).

On September 17, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 9). On October 2, 2014, the Appeals Council concluded that there

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. ___)" are to pages of the administrative record filed by Defendant as part of the Answer on December 23, 2014. (Doc. 7).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on October 17, 2014. (Doc. 1). On December 23, 2014, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 6 and 7). Plaintiff filed a brief in support of her complaint on January 26, 2015. (Doc. 8). Defendant filed a brief in opposition on March 2, 2015. (Doc. 11). Plaintiff filed a reply brief on March 5, 2015. (Doc. 12).

Plaintiff was born in the United States on February 26, 1962, and at all times relevant to this matter was considered a "an individual closely approaching advanced age."[5] (Tr. 157). Plaintiff completed two (2) years of college, and can communicate in English. (Tr. 166, 168). Her employment records indicate that she previously worked bus operator for the New York City Transit Authority from March of 1989 through May of 2011. (Tr. 159). The records of the SSA reveal that Plaintiff had earnings in the years 1979 through 1983 and 1985 through 2011. (Tr. 135). Her annual earnings range from a low of no earnings in 1984 to a high of eighty-nine thousand eight hundred thirty-one dollars and ninety-six cents

---

5. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(d).

($89,831.96) in 2010.  (Tr. 135).  Her total earnings during those thirty-two (32)

years were nine hundred fifty-five thousand four hundred dollars and ninety-three

cents ($955,400.93).  (Tr. 135).

In a document entitled "Function Report - Adult" filed with the SSA,

Plaintiff indicated that she lived in a house with her family.  (Tr. 186).  When

asked how her illnesses, injuries or conditions limited her ability to work, she

stated that:

> Because of [her] injuries, [she] was on medications that
> limit[ed] [her] ability to stay focus[ed], [that she] was always
> tired, [that her] lower back [was] in constant pain even with
> medication[, that she could] not sit for periods of time, [could
> not] drive for more than 10-15 minutes, [that her] foot
> cramp[ed] up in excruciating pain due to constant numbness
> [and that it was] not safe for [her] to drive.

(Tr. 186).  Before her illness, injuries or conditions, she worked for more than

twenty-three (23) years and took care of her five (5) children.  (Tr. 187).  She

needed sleep aids since her illnesses began because the pain made sleep difficult.

(Tr. 187).  When asked to check items which his "illnesses, injuries, or conditions

affect," Plaintiff did not check reaching, talking, hearing, stair climbing, seeing,

memory, concentration, understanding, following instructions, using hands or

getting along with others.  (Tr. 191).

From the time she woke up to the time she went to bed, she took Vicodin,

laid down until it took effect, was taken to any appointments she had, would eat if she were hungry, and would purchase fast food when she was out. (Tr. 187). She cared for her son, but at the time of the report, he did "all for [her]." (Tr. 187). She was able to prepare food such as cereal or packaged foods for about ten (10) minutes at a time, she did not do any house chores or yard work, she would only drive a car if she did not take her medicine due to the dizziness the medication caused, and she did not shop in stores. (Tr. 188-189). She could not walk far without extensive pain and swelling in her right leg, and could only walk about one hundred (100) feet before needing to stop and rest. (Tr. 191). Plaintiff was prescribed and used a cane and brace at all times. (Tr. 192).

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs or to take her medicine. (Tr. 188). She could count change, handle a savings account, and use a checkbook. (Tr. 189). She could pay attention for fifteen (15) to twenty (20) minutes, could not finish what she started, followed written and spoken instructions fairly well, and did not handle stress or changes in routine well. (Tr. 191-192).

Socially, Plaintiff went out when she had doctors' appointments, which was about two (2) to three (3) times weekly, or to attend church, and could not go out alone. (Tr. 189-190). She had no hobbies or interests. (Tr. 190). She spoke on

the telephone to her children and grandchildren two (2) to three (3) times weekly. (Tr. 190). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 191).

Plaintiff noted that she had tried to return to work, but that her doctor and chiropractor did not think it was safe. She stated that she was only "50 years old and [could not] function in [her] lower body." (Tr. 193).

At her hearing, Plaintiff testified that she was disabled due to back, leg, knee, and foot injuries and severe depression. (Tr. 34). At the time of the hearing, she was receiving worker's compensation in the amount of one thousand one hundred dollars ($1,100.00) biweekly. (Tr. 36). Her son, Josh, was seventeen (17) at the time of the hearing and was "pretty self-sufficient." (Tr. 36). He helped Plaintiff with things around the house like laundry, cleaning, and most of the chores. (Tr. 37). Her son or boyfriend drove her to her doctor's appointments in New York, which was a two and a half hour (2 ½) drive each way, and they would have to stop twice because she could not sit too long. (Tr. 39). She testified that she could stand for about four (4) or five (5) minutes at a time. (Tr. 39). She was able to walk for about half of her street for about ten (10) minutes and then would have to stop. (Tr. 46). She could not lift anything more than ten (10) pounds. (Tr. 47). She had to lie down every thirty (30) to forty-five (45)

minutes if she were sitting.  (Tr. 48).

Regarding her mental health, when questioned by the ALJ as to why she waited so long to see a mental health professional, Plaintiff explained that she had a hard time finding a doctor who would take worker's compensation medical coverage until she found Dr. Shpitalnik.  (Tr. 38).  She testified that her pain interfered with her ability to concentrate, and that the pain interfered with "my everything, my life."  (Tr. 47).

Regarding her physical impairments, Plaintiff testified that she had pain in her lower back, right buttocks, and the back of her knee, and total numbness and pins and needles in the right side of her right foot all the way down to her toes. (Tr. 40).  She was unable to attend pain management because she could not find someone who accepted her medical coverage.  (Tr. 40).  She stated that she did not want to have surgery on her knee because she would then not be able to work and take care of her seventeen (17) year old son and also because Dr. Sarro wanted to explore all other options before surgery.  (Tr. 42, 44).  She testified that her lower back and knee problems were about the same in terms of pain levels.  (Tr. 44). She was prescribed a cane by Dr. Sarro for balance.  (Tr. 46).

## MEDICAL RECORDS

On May 11, 2011, Plaintiff had an appointment with Anthony Sarro, M.D.

of Azimuth Medical, P.C. after slipping and falling while working as a bus driver a day earlier. (Tr. 319). It was noted that an abnormal physical examination included "edema of Plaintiff's hand and fingers together with lumbosacral and cervical spines pathological changes of spasm and limitation of motion together with crepitus and Lachman's sign of the right knee." (Tr. 319). Plaintiff received intraarticular injections into the right knee and wrist, and trigger point injections into the paravertebral muscles of the lumbosacral and cervical spines. (Tr. 319). Dr. Sarro noted that these treatments were effective in the alleviation of pain and spasm and in the restoration of function together with increase in range of motion ("ROM"). (Tr. 319).

On May 24, 2011, Plaintiff had an appointment with Dr. Sarro for injections. (Tr. 318). Dr. Sarro noted that treatment included intraarticular into Plaintiff's right ankle and foot and trigger point injections into the lumbosacral and cervical spines. (Tr. 318). Dr. Sarro noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 318). It was also noted that Plaintiff was to receive these treatments as noted and that she was totally disabled at that time. (Tr. 318).

On May 25, 2011, Plaintiff underwent a Worker's Compensation Initial Evaluation Report completed by a chiropractor named Dr. Richard Simeone as a

result of the May 10. 2011 slip and fall that resulted in injuries to Plaintiff's lower back, hands, and knees. (Tr. 270). Plaintiff stated she was experiencing constant sacro-iliac pain bilaterally and lower back pain and stiffness rated at a six (6) out of ten (10) with symptoms aggravated during the day by walking and with the pain radiating into her right leg. (Tr. 270). Her exam revealed the following: (1) moderate tenderness in the cervicothoracic and lumbar regions; (2) trigger points in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius active with radiation into the low back; and (3) subluxations and hypomobility at the cervical and thoracic regions. (Tr. 272). The diagnosis included a lumbar sprain/ strain, segmental dysfunction of the lumbar spine, sacroiliac sprain/ strain, disc displacement, low back pain, facet syndrome, myofascial pain disorder, altered gait, and internal knee derangement. (Tr. 272). Plaintiff was prescribed chiropractic physical therapy two (2) times per week for one (1) month. (Tr. 273). Dr. Simeone concluded it was too early to determine whether Plaintiff would be permanently disabled. (Tr. 273).

On May 27, 2011, Plaintiff underwent Magnetic Resonance Imaging ("MRI") of her right ankle due to pain. (Tr. 223). The impression was that there was a subtle partial intrasubstance noninsertional tear of the Achilles tendon approximately two centimeters (2 cm) proximal to the calcaneal attachment, and

mild productive dorsal osteoarthritic changes at the level of the talonavicular joint. (Tr. 224).

On June 14, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 275). Plaintiff noted a decrease in the frequency of her sacro-iliac pain bilaterally and lower back pain and stiffness since her last visit, and rated her pain to be improved to a four (4) out of ten (10) on the pain scale. (Tr. 275). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) increased ROM in the patient's lumbar region. (Tr. 275). Plaintiff underwent electrical muscle stimulation to reduce muscle spasms and kinetic activities to strengthen and recondition the full spine. (Tr. 275).

On June 23, 2011, Plaintiff had an MRI of her lumbosacral spine for lower back pain. (Tr. 225). The impression was that there was a one and four tenths (1.4) centimeter apparent Tarlov's cyst at the S2 level, and a shallow disc bulge at the T11-T12 level without significant neural foraminal or spinal canal compromise. (Tr. 226).

On June 27, 2011, a physician, whose name is illegible in the transcript,

opined that Plaintiff had temporary work restrictions including not lifting any weight, pushing and pulling no more than ten (10) pounds, an inability to bend, kneel, and walk, and an inability to work outdoors and at heights, to operate motor vehicles or mechanical equipment, or to perform repetitive movements. (Tr. 333).

On June 29, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 276). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 276). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) increased ROM in the patient's lumbar region. (Tr. 276). Plaintiff underwent traction to the full spine to increase motility. (Tr. 276).

On July 6, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 276). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 276). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum,

gluteus minimus and maximus, psoas and sartorius; and (3) increased ROM in the patient's lumbar region. (Tr. 276). Plaintiff underwent traction to the full spine to increase motility. (Tr. 276).

On July 12, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 276). Plaintiff noted a slight improvement with her bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit, and rated her pain at a three (3) out of ten (10). (Tr. 276). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 276). Plaintiff underwent traction to the full spine to increase motility. (Tr. 277).

On July 19, 2011, Plaintiff had an appointment with Marvin Moy, M.D. of Azimuth Medical, P.C. for persistent pain and dysfunction with limitation of motion of her ankle, leg, back, and neck. (Tr. 317). It was noted that Plaintiff was being treated for pain with injections, medications, and intraarticular injections, and was instructed to continue taking the medications prescribed, including Naprosyn, Soma, and Percocet. (Tr. 317).

On July 29, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 278). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had increased since her last visit. (Tr. 278). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) increased ROM in the patient's lumbar region. (Tr. 278). Plaintiff underwent traction and electrical muscle stimulation. (Tr. 278).

On August 5, 2011, Plaintiff had an appointment with Dr. Moy for injections. (Tr. 316). Dr. Moy noted that treatment included intraarticular and trigger point injections into Plaintiff's right knee, wrist, and the lumbosacral and cervical spines. (Tr. 316). Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 316).

On August 10, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 278). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 278). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and

lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 278). Plaintiff underwent traction and electrical muscle stimulation. (Tr. 278).

On August 11, 2011, Plaintiff underwent a nerve conduction study conducted by Anthony Sarro, M.D. for back pain radiating to the right gluteal and lateral thigh, and leg and foot numbness, tingling, and weakness due to the work-related slip and fall on May 10, 2011. (Tr. 227). The impression was that there was evidence of right sensory axonal and demyelinating peripheral neuropathy predominantly affecting the bilateral peroneal nerve and right sural. (Tr. 228).

On August 11, 2011, Plaintiff had an appointment with Dr. Moy for persistent pain and dysfunction with limitation of motion of her ankle, leg, back, and neck. (Tr. 315). It was noted that Plaintiff was being treated for pain with injections, medications, and intraarticular injections, and was to continue taking the medications prescribed, including Naprosyn, Soma, and Percocet. (Tr. 315).

On August 17, 2011, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 279). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 279). Her exam

also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 279). Plaintiff underwent traction and electrical muscle stimulation. (Tr. 279).

On September 12, 2011, Plaintiff had an appointment with Dr. Moy for injections. (Tr. 314). Dr. Moy noted that treatment included intraarticular and trigger point injections into Plaintiff's right knee, wrist, and lumbosacral and cervical spines. (Tr. 314). Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 314).

On September 19, 2011, Plaintiff had an appointment with Dr. Moy for injections. (Tr. 313). Dr. Moy noted that treatment included intraarticular and trigger point injections into Plaintiff's right knee, wrist, and lumbosacral and cervical spines. (Tr. 313). Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 313).

On October 11, 2011, Plaintiff had an appointment with Dr. Moy for

injections. (Tr. 312). Dr. Moy noted that treatment included intraarticular and trigger point injections into Plaintiff's right knee, wrist, and lumbosacral and cervical spines. (Tr. 312). Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 312).

On December 12, 2011, Plaintiff had an appointment with Dr. Moy for injections. (Tr. 311). Dr. Moy noted that treatment included intraarticular injections into Plaintiff's right knee, wrist, and lumbosacral and cervical spines. (Tr. 311). Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 311).

On January 9, 2012, Plaintiff had an appointment with Frank Hudak, M.D. for intermittent pain in the lower back with the last pain occurring three (3) weeks prior to the appointment and a constant and dull pain in the medial side of the right knee radiating into the medial side of the right leg. (Tr. 255, 257). It was noted that she walked with a cane in her left hand and was wearing an elastic support on her right knee and right ankle. (Tr. 258). Plaintiff's medical history from this exam noted that she was under the care of Dr. Simione, a chiropractor, once a week with no improvement, and that she continued under the care of Dr. Moy, an orthopedic surgeon, twice a week receiving multiple injections into the

lumbosacral spine that gave temporary relief for one (1) to two (2) hours. (Tr. 257). She had not yet been to a pain management specialist, but that she had MRIs of her lumbosacral spine and her right knee and an EMG test performed. (Tr. 257). Her medications included Naprosyn, Tylenol with Codeine, and Ambien. (Tr. 257). She reported the occasional use of a cane. (Tr. 257). An examination of her lower back revealed tenderness in the midline from the L4 to the S1 region, and when flexing forward eight (80) degrees at the waist, there was tension of her lower back. (Tr. 258). An examination of Plaintiff's bilateral lower extremities revealed negative left and right straight leg raising tests in the upright position, good motor power to the lower extremities with the knee and ankle reflexes zero (0), equal, decreased sensation over the lateral aspect of the right leg extending around to the dorsal aspect of the right foot, and intact sensation in the right lower extremity and the entire left lower extremity. (Tr. 258). The right knee ROM was zero (0) to one hundred (100) degrees with pain noted in the medial posterior aspect of the right knee and tenderness in the medial and posterior aspect of the right knee. ROM of the left knee was zero (0) to one hundred thirty-five (135) degrees, and there was a negative McMurray sign for the right knee with no effusion or crepitus. (Tr. 258). Dr. Hudak noted tenderness and hypersensitivity over the dorsal aspect of the right foot, tenderness over the

lateral right ankle, limited ROM of the right foot and ankle, and full ROM of the left ankle. (Tr. 258). Dr. Hudak diagnosed Plaintiff with status post sprain of the lumbosacral spine with right lumbosacral radiculopathy as well as status post contusion of the right knee and status post right ankle sprain. (Tr. 259). Dr. Hudak concluded the following: (1) Plaintiff had a temporary moderate partial disability; (2) Plaintiff should not engage in lifting, pushing, or pulling greater than ten (10) pounds; (3) Plaintiff should restrict kneeling on the right knee, walking, and bending at the waist; and (4) Plaintiff could not work outdoors, work at heights, operate a motor vehicle or mechanical equipment, or perform repetitive movements. (Tr. 259). Dr. Hudak recommended that Plaintiff be seen by a pain management specialist, and stated that no further physical therapy was needed for the lower back, right knee, or right ankle. (Tr. 259).

On February 6, 2012, Plaintiff presented to the emergency room ("ER") at Pocono Medical Center for right knee pain and ankle swelling with numbness in the knee to the toes and increased pain with ambulation for any time period. (Tr. 232). It was noted that Plaintiff was ambulatory, alert, comfortable, cooperative, oriented to person, place, and time, and well-groomed. (Tr. 233). Plaintiff's exam revealed that she had a steady gait, a normal upper and lower extremity range of motion, a normal back with no tenderness, and no edema. (Tr. 233, 235).

Plaintiff's final diagnosis was radiculopathy. (Tr. 232). Plaintiff was discharged home ambulating without assistance, and was accompanied and driven by a friend. (Tr. 234).

On February 22, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 280). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 280). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 280). Plaintiff underwent traction. (Tr. 280).

On February 24, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 282). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit. (Tr. 282). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 282). Plaintiff underwent traction and myofascial

trigger point release.  (Tr. 282).

On February 27, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone.   (Tr. 282).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had improved slightly since her last visit.  (Tr. 282).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region.  (Tr. 282).  Plaintiff underwent traction and myofascial trigger point release.  (Tr. 282).

On February 29, 2012, Plaintiff had an appointment with Dr. Moy for injections.  (Tr. 310).  It was noted that Plaintiff presented with anatomic areas that persistently exhibited pain and dysfunction with limitation of motion, and that Plaintiff was being treated by Dr. Moy with trigger point injections, medications, and intraarticular injections for injuries to the ankle, leg, back, and neck.  (Tr. 310).  Dr. Moy stated that Plaintiff could not function on a normal everyday basis without such medications and treatments, and prescribed Naprosyn, Soma, and Percocet for Plaintiff.  (Tr. 310).

On March 3, 2012, Plaintiff had a chiropractic appointment with Dr.

Simeone.  (Tr. 282).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit.  (Tr. 282).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region.  (Tr. 282-283).  Plaintiff underwent traction and myofascial trigger point release.  (Tr. 283).

On March 9, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone.  (Tr. 284).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had not changed since her last visit.  (Tr. 284).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region.  (Tr. 284).  Plaintiff underwent traction and myofascial trigger point release.  (Tr. 284).

On March 12, 2012, Plaintiff had a repeat examination with Dr. Hudak.  (Tr. 261-263).  This exam revealed minimal tenderness in the lower midline of the

lumbosacral spine, and pain when tilting thirty (30) degrees to both the left and right and when flexing forward at eighty (80) degrees from the waist.  (Tr. 262).

Decreased sensation over the dorsal aspect of the right foot was noted with the remaining sensation intact to the right and left lower extremities.  (Tr. 262).

Swelling and tenderness over the lateral aspect of the right ankle was present, and there was no tenderness of the Achilles tendon.  (Tr. 262).  Straight leg raising tests were negative bilaterally, and there was good motor power to the right and left lower extremities with the knee and ankle reflexes rated at zero (0) and equal. (Tr. 262).  Dr. Hudak diagnosed Plaintiff with status post sprain of the lumbosacral spine with right lumbosacral radiculopathy as well as status post contusion of the right knee and status post right ankle sprain.  (Tr. 263).  Dr. Hudak recommended Plaintiff lift no more than ten (10) pounds, not engage in pushing or pulling greater than twenty (20) pounds, be restricted to walking and bending, and not work outdoors or at heights, not operate a motor vehicle or mechanical equipment, and not perform repetitive movements.  (Tr. 263).  Dr. Hudak recommended that Plaintiff undergo new nerve testing of her lumbosacral spine and both lower extremities, and see a pain management specialist.  (Tr. 264).

On March 19, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone.  (Tr. 285).  Plaintiff noted her pain in the bilateral sacro-iliac and lower

back pain and stiffness had not changed since her last visit. (Tr. 285). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 285). Plaintiff underwent traction and myofascial trigger point release. (Tr. 285).

On April 4, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 286). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had increased since her last visit. (Tr. 286). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar region. (Tr. 286). Plaintiff underwent traction, electrical muscle stimulation, and myofascial trigger point release. (Tr. 286).

On April 9, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 286). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had mildly improved since her last visit. (Tr. 286). Her

exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region. (Tr. 286). Plaintiff underwent traction, electrical stimulation, and myofascial trigger point release. (Tr. 286).

On April 11, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 286). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had mildly improved since her last visit. (Tr. 286). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region. (Tr. 286-287). Plaintiff underwent traction, electrical stimulation, and myofascial trigger point release. (Tr. 287).

On April 18, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 288). Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had remained the same since her last visit. (Tr. 288). Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic

and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region.  (Tr. 288).  Plaintiff underwent traction, electrical stimulation, and myofascial trigger point release.  (Tr. 288).

On April 25, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone.   (Tr. 288).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had remained the same since her last visit.  (Tr. 288).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region.  (Tr. 288-289).  Plaintiff underwent traction, electrical stimulation, and myofascial trigger point release.  (Tr. 289).

On May 3, 2012, Plaintiff had an appointment with Dr. Moy for injections. (Tr. 309).  Dr. Moy noted that treatment included intraarticular injections into Plaintiff's right knee, wrist, and paravertebral muscles of the lumbosacral and cervical spines.  (Tr. 309).  Dr. Moy noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with

increase in ROM.  (Tr. 309).

On May 9, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 288).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had remained the same since her last visit.  (Tr. 290).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region.  (Tr. 290).  Plaintiff underwent traction and myofascial trigger point release.  (Tr. 290).

On May 9, 2012, Plaintiff had a chiropractic appointment with Dr. Simeone. (Tr. 291).  Plaintiff noted her pain in the bilateral sacro-iliac and lower back pain and stiffness had remained the same since her last visit.  (Tr. 291).  Her exam also revealed: (1) mild discomfort of her spinal tissues at the cervicothoracic and lumbar regions upon palpation; (2) moderate pain with an active myofascial trigger point with radiation to the low back in the multifidus, quadratus lumborum, gluteus minimus and maximus, psoas and sartorius; and (3) decreased ROM in the patient's lumbar and cervical region.  (Tr. 291).  Plaintiff underwent traction and myofascial trigger point release.  (Tr. 291).

On July 3, 2012, Plaintiff had an appointment with Dr. Coburn for injections. (Tr. 308). Dr. Coburn noted that treatment included intraarticular injections into Plaintiff's right knee, wrist, and paravertebral muscles of the lumbosacral and cervical spines. (Tr. 308). Dr. Coburn noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 308).

On August 27, 2012, Plaintiff had an appointment with Richard Radna, M.D. (Tr. 298). Plaintiff's chief complaint was lumbar pain with radiation down the right lower extremity into the area of the great toe. (Tr. 298). Plaintiff rated her pain at a four (4) out of ten (10) while at rest and a six (6) out of ten (10) while active. (Tr. 299). Dr. Radna noted that Plaintiff had reactive depression and that she was unable to be gainfully employed at that juncture. (Tr. 299). Dr. Radna's physical examination of Plaintiff revealed that there was mild paravertebral spasm in the lumbo-sacral region with mildly diminished ROM around the lumbo-sacral spine secondary to pain and mildly restricted bilateral straight leg raising tests. (Tr. 300). Dr. Radna's impression was that Plaintiff was experiencing causally-related lumbo-sacral, musculo-skeletal, and radicular pain syndrome. (Tr. 301). He recommended Plaintiff undergo "lumbar myelo and myelo CT to further characterize the relationship, if any with the sacral cyst to the theca." (Tr. 301).

On September 10, 2012, Plaintiff had an appointment with Dr. Coburn for injections. (Tr. 307). Dr. Coburn noted that treatment included intraarticular injections into Plaintiff's right knee, wrist, and paravertebral muscles of the lumbosacral and cervical spines. (Tr. 307). Dr. Coburn noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 307).

On September 21, 2012, Plaintiff had an appointment with Dr. Coburn for injections. (Tr. 306). Dr. Coburn noted that treatment included intraarticular injections into Plaintiff's right knee, wrist, and paravertebral muscles of the lumbosacral and cervical spines. (Tr. 306). Dr. Coburn noted these treatments were effective in alleviation of pain and spasm and in the restoration of function together with increase in ROM. (Tr. 306).

On November 14, 2012, Dr. Coburn filled out a Physical Residual Functional Capacity ("RFC") Assessment form. (Tr. 324). The diagnoses included "body injury [to the] back, neck, hands, wrist, and knee" with a poor prognosis. (Tr. 324). Plaintiff's symptoms were listed as pain, spasm, and limitation of motion in her back, wrist, knee, and neck rated at a nine (9) out of ten (10) on the pain scale. Dr. Coburn stated that Plaintiff's impairments could be expected to last at least twelve (12) months. (Tr. 324). Plaintiff was noted as

experiencing anxiety and depression as a result of her physical conditions. (Tr. 325). Dr. Coburn opined the following: (1) Plaintiff's pain and/ or symptoms were constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks during a typical workday; (2) Plaintiff was incapable of even low stress jobs; (3) Plaintiff could sit for twenty (20) minutes at a time before needing to get up; (4) Plaintiff could walk one (1) block without rest or severe pain; (5) Plaintiff could stand for fifteen (15) minutes before needing to sit down; (6) Plaintiff could sit and stand/ walk for less than two (2) hours in an eight (8) hour workday; (7) Plaintiff would need to include periods of walking around for five (5) minutes at a time for fifteen (15) minutes total during an eight (8) hour workday; (8) Plaintiff could rarely lift less than ten (10) pounds; (9) Plaintiff could occasionally look down, turn her head to the left or right, and look up; (10) Plaintiff could frequently hold her head in a static position; (11) Plaintiff could never twist, crouch, squat, or climb ladders; (12) Plaintiff could rarely stoop, bend, or climb stairs; (13) Plaintiff had significant limitations with reaching, handling, and fingering; (14) Plaintiff would be absent from work more than four (4) days per month; (15) Plaintiff's anxiety, depression, and post traumatic stress disorder were additional limitations that would affect her ability to work at a regular job on a sustained basis; and (16) Plaintiff was totally disabled and unable

to return to a full-time work schedule at any exertional level.  (Tr. 325-329).

On January 10, 2013, Plaintiff had an appointment with Dr. Coburn for injections into her right knee, wrist, and paravertebral muscles of the lumbosacral and cervical spines.  (Tr. 341).  It was noted that treatments were effective in the alleviation of pain and spasm and in the restoration of function together with increase in ROM.  (Tr. 341).

On March 4, 2013, Dr. Coburn reevaluated Plaintiff, and opined that Plaintiff was to be considered disabled because Plaintiff continued to have "signs and symptoms as noted and [had] not responded well to therapies."  (Tr. 338).

On March 30, 2013, Plaintiff had an initial psychiatric evaluation with Vilor Shpitalnik, M.D. for depression, anxiety, insomnia, lack of energy, persistent physical pain, and low self-balance.  (Tr. 343).  It was noted that Plaintiff was unable to sleep more than four (4) hours per night, experienced emotional instability, stopped engaging in almost all of her usual social activities, and became homebound.  (Tr. 343).  Her exam revealed that she was appropriately groomed and dressed, had a sad facial expression, had articulate, coherent, and goal directed speech, had a depressed, anxious, and tense mood, and had a constricted affect.  (Tr. 343).  She was alert and oriented to time and place, and her sensorum was clear.  (Tr. 344).  Dr. Shpitalnik diagnosed Plaintiff with Major

Depressive Disorder, and opined that Plaintiff was in good physical and psychological condition and was able to work full time.  (Tr. 344).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2016. (Tr. 17). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of May 10, 2011. (Tr. 17).

At step two, the ALJ determined that Plaintiff suffered from the severe[6] combination of impairments of the following: "obesity, subtle partial tear Achilles tendon right ankle, mild osteoarthritis right ankle, degenerative disc disease of the thoracic spine, neuropathy right lower extremity, and major depressive disorder (20 C.F.R. 404.1520(c))." (Tr. 17).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 17-19).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 19). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) except that [Plaintiff] is limited to occupations that require no more than occasional balancing, kneeling, crouching and crawling and climbing on

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

ramps and stairs, must avoid occupations that require climbing on ladders, ropes or scaffolds. She must avoid occupations that require pushing or pulling with the lower right extremity to include operation of pedals. She must avoid concentrated prolonged exposure to cold temperature extremes, extreme dampness and humidity, vibration or exposure to hazards such as dangerous machinery and unprotected heights. She is limited to occupations requiring no more than simple, routine tasks, not performed in fast-paced production environment, involving only simple work related decisions and in general relatively few work place changes.

(Tr. 19).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 23).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between May 10, 2011, the alleged onset date, and the date of the ALJ's decision. (Tr. 24).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ committed reversible error in failing to find that Plaintiff's bilateral peripheral neuropathy met and/ or equaled Impairment Listing 11.14; (2) the ALJ's RFC assessment

improperly afforded less weight to the treating physicians' opinions; (3) the ALJ improperly substituted her own opinion for that of a medical opinion in determining Plaintiff's RFC; (4) the ALJ did not take into account Plaintiff's required use of a cane in determining her RFC, and did not include the use of a cane in any of the hypotheticals posed to the VE; and (5) the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT"). (Doc. 8, pp. 6-22). Defendant disputes these contentions. (Doc. 11, pp. 11-33 ).

### 1.  **Medical Opinion Evidence**

Plaintiff asserts that the ALJ erred in the weight she afforded to the treating and examining source opinions. (Doc. 8, pp. 12-14). Plaintiff argues that the ALJ erroneously afforded little weight to Dr. Coburn's opinion because she did not identify any evidence that was inconsistent with or contradictory to Dr. Coburn's opinion. (Id.). "The ALJ simply conclude[d] that the 'objective evidence of record and the short treatment record with this provider do not support this opinion.'" (Id. at 12); (Tr. 22). Plaintiff also asserts that the ALJ erroneously provided little weight to the opinion of Dr. Hudak because it was consistent with the opinion of Dr. Coburn and Plaintiff's testimony, and the ALJ failed to identify any evidence contradicting Dr. Hudak's opinion that Plaintiff should not lift more than ten (10) pounds. (Id. at 14). Lastly, Plaintiff asserts that the ALJ relied on

her own expertise in arriving at the RFC rather than a medical opinion. (Doc. 8, p. 14).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Regarding the medical opinion evidence, the ALJ afforded little weight to the aforementioned opinion of Dr. Hudak because he saw Plaintiff "only one time and no other records support this level of limitation.  His opinion of disability is rejected . . . [because it] is not supported by the longitudinal record."  (Tr. 21). The ALJ afforded little weight to the aforementioned opinion of Dr. Coburn because:

> treating records do not support Dr. Coburn's assessment that [Plaintiff] is not capable of performing sustained work activity. . . . A treating physician is normally accorded greater weight, however the opinion must be supported by objective medical evidence, including imaging and the durational treatment records. The objective evidence of record and the short treatment record with this provider do not [] support this opinion.

(Tr. 22). The ALJ also afforded little weight to the opinion of Dr. Radna that Plaintiff was unable to be employed because "this single assessment is not consistent with the evidence that does not support [Plaintiff] being so limited." (Tr. 21). With regards to Plaintiff's mental health impairments, the ALJ gave some weight to the opinion of the State agency psychological expert that there was no medically determinable impairment given the lack of treatment, but "the undersigned finds there is evidence of a non-severe impairment." (Tr. 22). Lastly, the ALJ gave little weight to the function report signed by Plaintiff's boyfriend because he is not a credible medical expert.

In examining the weight the ALJ has afforded to these medical opinions, it is determined that while the ALJ gave "some" or "little" weight to multiple opinions, the ALJ has failed to explain what medical opinion she relied on in determining Plaintiff's RFC because she did not give any significant or great weight to any medical opinion. Instead, the ALJ seemingly interpreted the

medical evidence of record, and substituted her own opinion for that of a medical one in arriving at Plaintiff's RFC. The Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.). Therefore, because the ALJ has apparently relied on her own substituted medical opinion in arriving at Plaintiff's RFC, substantial evidence does not support the ALJ's RFC finding. As such, the remaining issues raised in Plaintiff's complaint will not be addressed as remand is warranted.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: August 31, 2015

**/s/ William J. Nealon**
**United States District Judge**
